U.S. SECURITIES AND EXCHANGE COMMISSION
By: Duane K. Thompson
100 F Street NE, Room 4216
Washington, D.C. 20549-5020
Phone: 202-551-7159
Fax: 202-772-9246

PAUL J. FISHMAN
United States Attorney
(Designated Local Counsel)
By: J. ANDREW RUYMANN
Assistant U.S. Attorney
402 East State Street, Room 430
Trenton, New Jersey 08608
Phone: 609-989-0563
Fax: 609-989-2360

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| v. | CASE NO.  3:11-CV-00916-AET-DEA |
| **SECURE CAPITAL FUNDING CORPORATION,** 125 Half Mile Road, Suite 200 Red Bank, New Jersey 07701-6749, | **FIRST AMENDED COMPLAINT** |
| **BERTRAM AUGUSTUS HILL,** 5 Shallows Brook Road Morganville, New Jersey 07751-4649, | |
| **KIAVANNI PRINGLE,** 33 West Ayer Metheun, MA 01844-5510, | |
| **ALAN SMITH,** c/o Secure Trust Hauptstrasse 43 Welschenrohr, Switzerland CH-4716 | |
| **SECURE TRUST,** Hauptstrasse 43 Welschenrohr, Switzerland CH-4716, | |

**and**

**ST UNDERWRITERS
CORPORATION,**
34-20 Calle 34
Panam 5
Panama City
Republic of Panama

**Defendants.**

Plaintiff, U.S. Securities and Exchange Commission alleges as follows against the above-named Defendants:

## SUMMARY

1.     This case concerns a "prime bank" fraud perpetrated by defendants using the Internet and other facilities of interstate commerce to ensnare unsuspecting investors in a scheme to sell fictitious securities based on false promises of high returns with no risk.  Defendants have falsely claimed to provide access to international banking facilities that offer risk-free Swiss debentures and trading accounts with credit lines leveraged one hundred times the price of the debenture. The banking facilities, the debentures and the trading accounts are all fictitious.  More than $3 million of investor funds has been spirited to accounts in the Republic of Latvia without investors' knowledge or permission.  Nearly $1.5 million more in investor funds has been used to pay individual promoters in the U.S. and abroad that solicited the victims of the scheme.  By their conduct, all defendants have violated Section 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and77(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

2

2.     Defendant Alan Smith is an individual who controls defendants Secure Trust and ST Underwriters and who masterminded the prime bank fraud. (Smith, Secure Trust and ST Underwriters are referred to herein collectively as the "Secure Trust Defendants").   The Secure Trust Defendants participated in the violations described above and continue to violate the anti-fraud provisions of the securities laws by aggressively seeking new victims though Internet solicitations and various intermediaries.  The Secure Trust Defendants have also held themselves out as providing brokerage services but have not registered as brokers with the Commission.  By their conduct, the Secure Trust Defendants are in violation of Section 5(a) and (c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a) and77(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Section 15(a) of the Exchange Act [15 U. S.C. §70o(a)].    Unless preliminarily and permanently enjoined, the Secure Trust Defendants will continue to violate the law and harm investors.

## JURISDICTION AND VENUE

3.     The Commission brings this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. 77t(b) and 77v(a)] and Sections 21(d) and (e) and 27 of the Exchange Act [15 U.S.C. 78u(d), (e) and 78aa].  The Commission alleges that defendants, directly and indirectly, made use of the mails, the means and instrumentalities of transportation and communication in interstate commerce in connection with the transactions, acts and practices and courses of conduct alleged in this First Amended Complaint.

4.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C.§ 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants are found, are inhabitants of or transact business in this District, and certain acts and transactions constituting violations of the federal securities laws occurred in this District.

3

## DEFENDANTS

5.    Alan Smith ("Smith") is an individual of unknown residence who holds himself out as "counsel" to Secure Trust and ST Underwriters.  Smith has also held himself out to at least one customer of Secure Trust as that customer's "Secure Trust Bank officer" representative.  Smith has also claimed to be a "legal representative" of ST Underwriters named "H. Draudins" in communications with investors.  At all material times, Smith has directed and controlled both Secure Trust and ST Underwriters.  On April 7, 2011, "Draudins" transmitted to the Commission staff a Wells Submission which appeared to be submitted on the joint behalf of Secure Trust, ST Underwriters and Smith.   Smith has had numerous communications with the staff of the Commission by telephone and email since February 2011.   Smith has declined, however, to disclose his nationality, physical location, residential address or any other legal or fictitious names by which he has been known.

6.    Secure Trust holds itself out on the Internet as a company that is located in Welschenrohr, Switzerland.  Secure Trust purports to be the parent of defendant ST Underwriters and the ultimate parent of defendant SCF.  Secure Trust is not authorized by the Swiss Financial Market Supervisory Authority ("FINMA") to conduct financial business in Switzerland.  Secure Trust is on FINMA's published "black list."

7.    ST Underwriters holds itself out on the Internet as a private banking group that operates out of Panama City, Panama.  ST Underwriters purports to be the parent of defendant SCF.  ST Underwriters also holds itself out as a subsidiary of defendant Secure Trust.

8.    Secure Capital Funding Corporation ("SCF") is a Delaware corporation whose sole officer and director was defendant Bertram Augustus Hill at least through March 16, 2011.  SCF purports to be a subsidiary of ST Underwriters.

4

9.    Bertram Augustus Hill ("Hill") resides in Red Bank, New Jersey. According to the Financial Industry Regulatory Authority ("FINRA"), Hill was a registered representative from 1997-2001 and was a member of FINRA. During that time, Hill was the subject of at least three customer complaints. FINRA suspended Hill's registration in 2002 and levied a $5,000 fine which Hill never paid.

10.   Kiavanni Pringle is a Massachusetts resident. Doing business as "PP&M Trade Partners," Pringle directed investors to remit monies to an account maintained by defendant SCF in New Jersey.

### FACTS

**Defendants' Offer and Sale of Fictitious Securities and Trading Accounts**

11.   Defendants have used the Internet and other facilities of interstate commerce to market and sell fictitious investment products and services to unsuspecting investors in the United States and abroad since at least the third quarter of 2010. The Secure Trust Defendants controlled the scheme. The Secure Trust Defendants have used Hill, SCF, Pringle and other purported corporate affiliates, promoters or intermediaries to recruit investors. The Secure Trust Defendants were to receive at least 80% of the fraud proceeds while other participants in the scheme were to receive lesser agreed percentages and/or commissions from investors. Investors, unbeknownst to them, were not to receive, and have not received, any return of principal, any interest or investment returns or any access to leveraged funds for securities trades. The Secure Trust Defendants have sought to further victimize investors by purporting to charge substantial "interest" on the fictional trading accounts.

12. Hill, SCF, Pringle or other purported corporate affiliates, promoters or intermediaries of the Secure Trust Defendants typically made the initial approach to potential investors. Investors were led to believe that the Secure Trust Defendants could provide highly leveraged investment vehicles in connection with private, on-line banking services. Some investors were directed to the websites operated by ST Underwriters and/or Secure Trust to obtain information about the purported securities offerings. SCF also operated a website that purported to provide information about the securities offerings. The Secure Trust Defendants controlled the content of the SCF website.

13. Defendants' fraudulent scheme targeted investors with the promise that the securities products and services offered by the Secure Trust Defendants, with no risk to principal, would reverse portfolio losses caused by the economic recession and general decline in securities valuations. The following false assertions made on the website of ST Underwriters typify the misrepresentations:

**Portfolio Protection Program**

**A Program for Investors Tired of Stock Market Volatility**

(The following service is offered through ST Underwriters' correspondents including Secure Trust)

Question: I have lost 50% of my capital in the recent downturn in world stock prices. What should I do?

**Solution:** If you wish to repair the damage done by recent market volatility, protect your capital and are willing to be patient then you may consider our portfolio repair and protection program to provide both security and high yield growth.

Question: I put $500,000 into my stock trading account one year ago and it is now worth $250,000. How can you help me?

**Solution:** If you authorize us to manage your investment funds, we will do the following for you.

6

1. We will convert the $250,000 to 294,000 Swiss Francs.

2. We will use the 294,000 Swiss Francs to buy a Swiss Franc debenture in the face amount of 588,000 Swiss Francs due in 10 years and 3 months. At the current exchange rate, 5888,000 Swiss Francs equals $500,000, the amount of your original investment.

3. We will use the 588,000 face value debenture as margin to earn additional income without risking the 588,000 capital amount. Accounts by which this is done are sometimes called non-depletion accounts and are associated with various high yield trading programs. Our program is different. The use of your debenture as margin to earn additional income for your account will be implemented through escrow accounts at ST Underwriters that guarantee your 588,000 will not be at risk. Your capital will be restored. You will earn high income. You will be able to sleep well at night.

14. Although the initial approach to investors typically has been made by the corporate affiliates, promoters and intermediaries used by the Secure Trust Defendants, investors have been required to submit account opening information to Secure Trust. Secure Trust has been the counterparty on the contractual instruments that investors have been required to execute. Secure Trust told investors that they would be purchasing "debentures" as the initial step in the investment program. The standard contract used by Secure Trust is a form document titled "Customer Agreement and General terms and Conditions" ('Agreement"). The Agreement states in its "Governing Law" subpart that "[a]ll deposits to ST in Switzerland directly or indirectly to any Swiss or other Swiss related account are hereby agreed to be solely for the purpose of purchasing debentures of Secure Trust." The characterization of the things being offered for sale as "debentures" is also made on the ST Underwriters web site as quoted in paragraph _ above of this First Amended Complaint. The wire instructions for remission of payments from investors also refer to the things being sold as "debentures."

15. A major inducement for investors to purchase debentures was defendants' representation that investors would be afforded on-line access to leveraged trading accounts

7

accessible through Secure Trust's website. Defendants told investors that "100 to 1 leverage" would be available to them. Defendants also told investors that Secure Trust would serve as the "depository institution" for securities that investors purchased through these leveraged trading accounts. All those representations were false. The promised trading accounts have existed only as simulated data displayed on Secure Trust's website. Those data have not reflected actual economic transactions. Some investors were able to log into the web accounts to view purported balances and records of securities transactions. No investor, however, has ever been able to retrieve any funds from the fictional accounts. No investor has ever had been able to obtain independent verification concerning securities supposedly purchased and held in deposit by Secure Trust.

16. All told, more than $4 million has been raised by defendants, directly and through promoters and brokers, through this offering. At least, $465, 000 has been raised from investors residing in the United States. The largest investment by a single investor residing in the United States has been approximately $250,000. Foreign investors have also been ensnared in Defendants' scheme. One individual residing in Ireland invested over $1.3 million. Another individual residing in Switzerland invested over $1.5 million. On information and belief, none of the investors has received any of the promised monthly returns. The on-line account access of at least one investor has been inaccessible since the beginning of February, 2011. Moreover, a number of investors now have negative balances from accrued "interest" charges on the fictitious accounts.

**Domestic Bank Accounts Used to Receive and Transmit Investor Funds**

17.   Defendants told investors to send purchase money for debentures either to SCF or another purported affiliate of Secure Trust located in Riverside, California named "Secure Capital Corporation" ("SCC").

18.  Foreign and domestic investors wired approximately $3.5 million to SCF's JP Morgan Chase account in Colts Neck, New Jersey from September 2010 through February 2011..   Hill was the sole authorized signatory on this account.   The account is identified as Account No. xxxx6052.

19.   Though initially sent to Account No. xxxxx6052, funds Defendants received from investors appear to have been distributed to JP Morgan Chase Account No. xxxxx2665 in the name of Doxa Management Group, LLC ("Doxa").   Hill is the sole authorized signatory on the Doxa account.

20.  In addition to accounts maintained with JP Morgan Chase, funds Defendants received from investors may have been distributed to a corporate brokerage account in the name of SCF with Merrill Lynch, Account No. xxx-04099.    Hill is the sole authorized signatory on this account.

21.   Foreign and domestic investors wired approximately $560,000 to SCC's JP Morgan account in California from November 2010 through February 2011.

**Transfer of Investor Funds to Latvia**

22.  Despite telling investors that their initial investment in debentures was risk-free, Defendants have never returned any principal to investors.  Defendants have misappropriated the purchase monies for their own uses.  Unbeknownst to investors, Smith directed SCF and SCC to

9

send all investor monies to an account in Latvia, minus various "commissions" and "fees paid to SCF, SCC and various other promoters. All told, approximately $2.8 million was transferred into the bank account in Latvia. Investors were not told that their money would be sent to Latvia. Investors never gave permission for their money to be sent to Latvia. The transfer of funds to the account in Latvia constituted an independent deceptive act within the scheme.

23. Between December 2010 and January 31, 2011, Hill caused to be transferred from JP Morgan Chase Account No. xxxxx6052 approximately $2.4 million dollars to accounts in Latvia. None of the funds received by Defendants from investors ever to have been transferred to Switzerland to purchase the debentures that Defendants claimed to be selling or to establish actual "insured" margin brokerage accounts.

24. The investor monies transferred into the Latvian bank are not being held in trust for investors or otherwise being credited to their accounts. The account documentation instead purports to reflect that the wire transfers were payments for debentures being purchased in the name of SCF or SCC. On information and belief, no such debentures were ever issued or existed. On further information and belief, the Secure Trust Defendants arranged to have the transactions characterized as purchases of debentures for the account of SCF or SCC in order to facilitate and disguise the laundering of monies swindled from investors.

### Post-Sale Frauds

25. Defendants have also engaged in post-sale activities that constitute independently deceptive acts within the scheme. The Secure Trust Defendants have sought to forestall detection of their point-of-sale frauds by fraudulently telling investors who tried to access their fictional trading accounts that they simply misunderstood what they had purchased and on what terms. The *post hoc* explanations put forward by the Secure Trust Defendants seek to exploit

10

deliberate ambiguities in their prior representations to investors.  For example, Secure Trust sent one investor a letter stating that "[a]pplications are now being accepted for lines of credit starting from $5,000,000 with leverage as agreed" and that "[t]he origination fee is a modest one percent."  SCF followed up with a "Dear Valued Client" letter to the same investor purporting to confirm "that we will accept your on line account application for our 100 to 1 leverage program for financing the trading of shares, bonds, notes, commodities etc."  SCF instructed that each page of the enclosed 27-page Agreement be initialed and returned.   Nothing in the Agreement explains how the "modest one percent" fee would be calculated.   Notwithstanding the Agreement's silence on the question, the Secure Trust Defendants later asserted that the one percent origination fee equals the investor's total initial investment.  According to the Secure Trust Defendants, an investor who sent SCF $50,000 and thought that their capital was not "at risk," as is stated on the ST Underwriters website, actually had not invested any "capital" at all.  Rather, the Secure Trust Defendants later asserted that the entire $50,000 investment was a "fee" for establishing a $5 million "credit line."

26. The Secure Trust Defendants have also imposed other absurd requirements to continue to defraud investors and thwart their attempts to access their supposed margin trading accounts at Secure Trust.  For example, the Agreement sets forth a convoluted formula to determine the amount of "available funds" supposedly in a margin account.  The formula bears no resemblance to the simple "100 to 1" leverage offer made on the Internet and in other solicitations.  Similarly, under "Margin Account," the Agreement states that the client must have on deposit "collateral as required by ST" in order to draw on the credit lines to make securities trades.  In a separate part of the Agreement headed "Credit Facility Agreement," it is stated that no funds can be accessed unless Secure Trust's counsel "has certified that the collateral has been

11

posted in an approved form and manner."   The Agreement does not specify the amount of collateral that must be posted.   Only after receiving investors' money to establish trading accounts have the Secure Trust Defendants informed investors that they must post "collateral" in an amount equal to 108% of the credit being sought.   Thus, an investor who was led to believe that a $5 million margin trading account was being established would be required to post collateral of $5.4 million. The Secure Trust Defendants have used this unwritten requirement to conceal the fact that the trading accounts exist in name only.

27. The Secure Trust Defendants have also required all investors to execute form letters expressing complete satisfaction with Secure Trust's products and services before any products or services were actually provided to them. Execution of the form letter has been as a condition precedent for access to the website that the Secure Trust Defendants have used to create the impression that trading accounts exist. The Secure Trust Defendants imposed this requirement in hopes of creating a defense to any securities fraud and/or breach of contract litigation that might be filed against them.  Investors are not satisfied with the fictional products and services sold to them by the Secure Trust Defendants.

28. The Secure Trust Defendants have purported to demand that investors pay "interest" on the nonexistent trading accounts. On March 14, 2011, for example, ST Underwriters sent a document formatted as an arbitration demand to a retired school teacher who lives in Anaheim, California.  The document purported to initiate an arbitration proceeding before the London Court of International Arbitration ("LCIA") and was signed by an "H. Draudins." On information and belief, Smith was the person claiming to be H. Draudins.   No proceeding against the retiree has actually been instituted before the LCIA. Nonetheless, the document that ST Underwriters sent to the retiree asserted that he owed $76,777 interest on a trading account

12

that was supposedly opened in his name after he sent $50,000 to SCF in December 2010. The document also asserts that the retiree will be required to pay fees to initiate the arbitration proceeding. The retiree had never been able to draw any funds from the fictional trading account.

### Materially False Statements and Omissions

29. In offering and selling purported Swiss debentures to investors, defendants made materially false statements and omitted material information. Defendants did not disclose that neither the debentures nor the margin trading accounts existed as legitimate investment vehicles.

30. Smith knew or was reckless in not knowing that neither the debentures nor the margin accounts defendants were offering and selling to investors existed as legitimate investment vehicles.

31. Secure Trust knew or was reckless in not knowing that neither the debentures nor the margin accounts defendants were offering and selling to investors existed as legitimate investment vehicles.

32. ST Underwriters knew or was reckless in not knowing that neither the debentures nor the margin accounts defendants were offering and selling to investors existed as legitimate investment vehicles.

33. Hill knew or was reckless in not knowing that neither the debentures nor the margin accounts defendants offered and sold to investors existed as legitimate investment vehicles. SCF knew or was reckless in not knowing that neither the debentures nor the margin accounts defendants were offering and selling to investors existed as legitimate investment vehicles.

34. Pringle knew or was reckless in not knowing that neither the debentures nor the margin accounts defendants were offering and selling to investors existed as legitimate

investment vehicles.   Pringle also deliberately led investors to believe that he had substantial experience in securities trading knowing that claim to be false.   Pringle also deliberately led investors to believe that he was part of an operating company known as "PP&M Trade Star Partners" knowing that no such company existed other than as a trade name.

### Smith's Central Role in the Scheme

35.   At all material times, Smith has directed and controlled the fraudulent activities of Secure Trust and ST Underwriters complained of herein.   In the alternative, Secure Trust and ST Underwriters do not exist as legal entities and are merely trade names that Smith has used to perpetrate the frauds complained of herein. On information and belief, Smith conceived the prime bank fraud scheme and developed or procured the websites, the offering materials and the form contract used to perpetrate the frauds complained of herein.   On further information and belief, Smith has used other names in communications with third parties to create the false impression that Secure Trust and ST Underwriters are substantial companies that are well staffed and able to deliver the products and services described in their website, offering materials and form contract.

36.   Smith directed and controlled the activities of Hill and SCF complained of herein. Smith determined the allotted "fees" and/or "commissions" to be paid for "services" performed by Hill, SCF, SCC and other promoters or intermediaries. Smith has had direct communications with at least two investors in furtherance of the fraudulent scheme.   One of those investors was located in the United States.   Smith directed that all investors send funds to SCF or SCC in the United States.   Smith directed that SCF and SCC wire the lion's share of investor funds to the bank account in Latvia.   Smith sent or caused to be sent the purported arbitration demands claiming that investors owe interest on the fictional trading accounts.

14

37.  Smith was introduced to Pringle through a New Zealander who held himself out as a "representing broker" familiar with the 100 to 1 leveraged trading account products advertised on websites controlled by the Secure Trust Defendants.  In a November 2010 telephone call with Pringle, Smith explained how those products were offered to investors.  Smith later accepted as clients investors brought to the Secure Trust Defendants through Pringle.  Smith instructed Pringle to have those investors transmit purchase money through J.P. Morgan Chase bank accounts in New Jersey and California.  Pringle acted on those instructions.

38.  Smith, through the defendants' various websites, SCF, SCC, Hill, Pringle and various other promoters, sent investors contracts and other documentation required to establish trading accounts with the Secure Trust Defendants.  Investors were instructed to send executed contract documentation to Smith.  Smith sent wire instructions to investors that required purchase money to be sent to SCF or SCC bank accounts with J.P. Morgan Chase in either New Jersey or California.

39.  Smith had a direct telephone call with the president of a boarding school for boys in Brandon, Florida that was induced to pay $50,000 to establish a highly leveraged margin trading account with Secured Trust in December 2010.  Smith provided assurances to representatives of the school that the investment products being offered were legitimate.  Smith's assurances were knowingly false.  Smith's assurances induced the representatives to send purchase money to SCF's bank account with J.P. Morgan Chase in New Jersey.

40.  Smith had a direct telephone call with a retired individual in the United Kingdom, who was induced to pay the equivalent of approximately $1.3 million to establish a highly leveraged margin trading account with the Secure Trust Defendants in November, 2010.  Smith

15

provided assurances to the retiree that the trading accounts in which the investor had invested were legitimate. Smith's assurances were knowingly false.

41. Smith, either in his own name or in the name of fictitious persons represented to be officers of Secure Trust or ST Underwriters, has contacted investors to demand "interest" purportedly due and owing on margin trading accounts. In the same communications, Smith has purported to demand arbitration. Smith knew or was reckless in not knowing that no interest was due and owing because no credit had ever been extended. Smith knew or was reckless in not knowing that no arbitration proceedings had been commenced.

### Hill and SCF's Participation in the Scheme

42. Beginning at least in September 2010, SCF has offered securities in the form of investment contracts that purport to provide margin brokerage accounts or highly leveraged lines of credit. Hill and SCF have used promoters, multiple websites and offering materials to induce investors to purchase what these defendants represented were risk-free "private placement debentures" issued or to be issued by or through Secure Trust in Switzerland. Hill and SCF also represented to investors that the debentures could be pledged to establish margin brokerage accounts with Secured Trust that could be leveraged up to 100 times the face value of the debentures. Hill and SCF, either directly or through promoters and introducing brokers, represented to investors that investment returns would be 10-100% monthly. According to some investors, SCF charges them $2,000 every "45 to 60 days" to facilitate the leveraged credit line. According to Hill's attorney, Hill received 20% of the originating fees from investors he brought into Secure Trust. After he received his 20%, Hill transmitted the remaining investor funds as directed by Alan Smith, on behalf of ST Underwriters.

43. Hill induced a boarding school for boys in Brandon, Florida to pay $50,000 to establish a highly leveraged margin account with Secured Trust in December 2010. According to school representatives, Hill stated that SCF would charge the school a maintenance fee of $2,000 every 45 to 60 days. In interstate telephone calls and in email messages, Hill represented to the school's operators that they would be able to access the account to make securities trades directly. The school received access to a Web site that purported to show activity in the margin account, including a purported "balance" of almost $5 million available to make trades on margin. The school has never received any account statements. The school has never received any monthly payments or earnings on the purported debentures upon which the margin account was supposed to have been established.

### Pringle's Participation in the Scheme

44. Pringle and PP&M have used a similar model to raise money for SCF in exchange for a fee of 3% of all "assets under management." The offering presented to investors by Pringle and PP&M, unlike the offering presented to investors by SCF and Hill, asserts that Pringle would professionally select the securities to be purchased from the margin brokerage accounts that were supposed to be established for the investor based upon the investor's purchase of Swiss debentures. In contrast, the offering presented to investors by SCF and Hill represented that investors would make their own trading decisions.

45. Pringle and PP&M advertised on multiple, detailed websites and through word of mouth, to engage retail brokers to find investors that Pringle and PPM could contact and induce to buy securities. In exchange for the services of retail brokers, Pringle and PPM offered to pay "commissions" of up to 4% of investor gains.

17

46. For example, Pringle and PP&M used a retail broker to locate a retired school teacher who lives in Anaheim, California. The retiree is not an "accredited investor" within the meaning of regulations promulgated by the Commission that exempt offerings of securities from registration requirements, as he has an annual income of less than $200,000 and a net worth of less than $1 million.   Nonetheless, the retiree was instructed to wire $50,000 to a bank account controlled by SCF. The retiree was told that the fund would be used to purchase "non-depleting" "risk free" Swiss debentures. He was further told the debentures would secure a $5 million credit line that Defendants would manage for his benefit. Pringle and PP&M told the retiree that he would receive 10 to 100% monthly returns, and that there was no risk to his initial $50,000 investment. The retiree was provided with login information and a username for a website that purported to provide account access. The retiree has never received any account statements, trade confirmations or other documentation. The retiree has also never received any monthly payments or earnings on the purported debentures upon which the margin account was supposed to have been established.

### Unregistered Sales to Non-Accredited Investors

47. None of the offerings and sales of purported Swiss debentures made by Defendants beginning in September 2010 have been registered with the Commission by an issuer in accordance with the federal securities laws. At least some of the sales made by Defendants have been made to persons who did not qualify as "accredited investors" so as to exempt Defendants from the obligation to register the securities offerings and make required disclosures. None of the Defendants ever sought or obtained an exemption from the registration requirements.

## Brokerage Services without Registration

48.     Secure Trust and ST Underwriters have held themselves out as offering the services of a broker-dealer that require registration with the Commission. For example, ST Underwriters' website states:

> ST Underwriters Corporation provides a variety of financial services to its clients including, but not limited to, IPO's, registrations of high yield debt offerings and private placement services available through correspondents worldwide and in Switzerland through our investment banking division. We can make a market in your securities offering.

49.   Secure Trust and ST Underwriters also advertise on their website that they trade for clients "all exchange listed and over the counter unlisted securities in registered and bearer form on the following exchanges ... NASDAQ, New York ..."    Moreover, with respect to the leveraged trading accounts supposedly being established for investors, the "Applicable Rules and Regulations" subpart of the Agreement states:

> All transactions in the customer's account shall be subject to the constitution, rules, regulations, customs and usage's [sic] of the exchange or market, and its clearing house, if any, where the transactions are executed by ST or its agents, including its subsidiaries and affiliates.  Also, where applicable, the transactions shall, for transactions executed through the USA, be subject (a) to the provisions of (i) the Securities and Exchange Acts of 1933 and 1934, as amended, and ... (b) to the rules and regulations of (i) the Securities Exchange Commission....

50.     Neither Secure Trust nor ST Underwriters are registered with the Commission or FINRA in any capacity.   Finally, Secure Trust and ST Underwriters also run a self described "Swiss Interbank Over the Counter Exchange" called Secure Mall over the Internet.  Secure Mall lists more than two dozen private placement debenture offerings.  Approximately half of the offerings are investments in U.S. ventures.    From September 2010 through February 2011, at

least five U.S. investors invested through ST Underwriters' US subsidiaries and sent a copy of their U.S. drivers' license or passport to Smith. Additionally, Smith directed all investors to wire funds to the U.S.

51.      Smith caused Secure Trust and ST Underwriters to hold themselves out as offering the services of a broker-dealer. In the alternative, Smith provided assistance to Secure Trust and ST Underwriters in holding themselves out as offering the services of a broker-dealer. At all material times, Smith knew that neither Secure Trust nor ST Underwriters were registered with the Commission or FINRA in any capacity.

### Defendants' Continuing Violations

52. The Secure Trust Defendants continue to advertise fictitious securities products and services on their websites and continue to seek to sell such products and services to unsuspecting investors in the United States and abroad. The Secure Trust Defendants also continue to mislead past victims of their fraud by purporting to charge "interest' on fictional trading accounts and to demand arbitration.

### FIRST CLAIM

### Fraud in the Purchase and Sale of Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

### (All Defendants)

53. Plaintiff repeats and realleges Paragraphs 1 through 52 above.

54. By engaging in the conduct described above, each of the Defendants, directly or indirectly, acting knowingly or recklessly, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce, or of the mails: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material facts

necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices or courses of conduct which operate as a fraud or deceit upon certain persons.

55. By engaging in the conduct described above, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F/R. § 240.10b-5].

## SECOND CLAIM

### Fraud in the Offer and Sale of Securities in Violation of Section 17(a) of the Securities Act (All Defendants)

56. Plaintiff repeats and realleges Paragraphs 1 through 55 above.

57. By engaging in the conduct described above, each of the Defendants directly or indirectly, in the offer or sale of securities by the use of the means and instrumentalities of interstate commerce, or of the mails, acting knowingly, recklessly or negligently, (a) have employed or are employing devices to defraud, (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices or courses of conduct which operate as a fraud or deceit upon certain persons.

58. By engaging in the conduct described above, defendants violated and, unless enjoined, will continue to violate Section 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

## THIRD CLAIM

### Unregistered Offer and Sale of Securities in Violation of Section 5(a) and (c) of the Securities Act

### (All Defendants)

59. Plaintiff repeats and realleges Paragraphs 1 through 58 above.

60. By engaging in the conduct described above, each of the Defendants directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: (a) without a registration statement in effect as to the securities, sold such securities through the use or medium of a prospectus or otherwise; or (b) offered to sell through the use or medium of a prospectus or otherwise securities as to which a registration statement had not been filed.

61. By engaging in the conduct described above, each of the Defendants violated and, unless enjoined, will continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a).

## FOURTH CLAIM

### Acting as Brokers without Registration in Violation of Section 15(a) of the Exchange Act

### (Secure Trust and ST Underwriters)

62. Plaintiff repeats and realleges Paragraphs 1 through 61 above.

63. By engaging in the conduct described above,  Secure Trust and ST Underwriters, directly or indirectly, singly or in concert, while acting as a broker or dealer, have made use of the mails or any means or instrumentality of interstate commerce in effecting transaction in or inducing or attempting to induce the purchase or sale of securities when such persons or entities

22

were not registered with the Securities and Exchange Commission as a broker or dealer or when such persons were not associated with an entity registered with the SEC as a broker-dealer.

64. By reason of the foregoing, Smith, Secure Trust and ST Underwriters have violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## FIFTH CLAIM

### Aiding and Abetting Secure Trust and ST Underwriters' Violations of Section 15(a) of the Exchange Act

### (Smith)

65. Plaintiff repeats and realleges Paragraphs 1 through 64 above.

66. Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)] provides that any person that knowingly provides substantial assistance to another person in the violation of a provision of the Exchange Act, or any rule or regulation thereunder, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

67. By engaging in the conduct described above, Secure Trust and ST Underwriters violated Section 15(a) of the Exchange Act by acting a brokers with respect to securities offerings without being registered as such with the SEC.

68. Smith, in the manner set forth above, knowingly or recklessly provided substantial assistance to Secure Trust and ST Underwriters' violations of Section 15(a).

69. By reason of the foregoing, Smith aided and abetted Secure Trust and ST Underwriters' violations of Section 15(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this honorable Court:

1.   Award Plaintiff such preliminary injunctive relief as may be necessary to avert the likelihood of further injury to investors during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to ordering defendants Smith, Secure Trust, ST Underwriters, SCF and Hill (a) immediately to cease and desist from transferring any monies out of JP Morgan Chase Account No. xxxxx6052 or from Merrill Lynch Account No. xxx-04099 and (b) to cause the repatriation into JP Morgan Account No. xxxxx6052 of approximately $2.8 million of investor funds previously transferred out of the country to accounts in Latvia and any additional investor funds transferred to accounts in Jamaica or elsewhere and the deposit of such repatriated funds into the registry of this Court pending the conclusion of the action.  Plaintiff further requests that all Defendants be ordered to provide an accounting for all monies received from investors that have purchased securities from Defendants in the period September 2010 to the present date.

2.   Enter a permanent injunction enjoining Defendants from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

3.   Enter a permanent injunction enjoining defendants from  violating Section 17(a) of the Securities Act;

4.   Enter a permanent injunction enjoining Defendants from violating Section 5(a) of the Securities Act;

5.   Enter a permanent injunction enjoining Defendants from violating Section 5(c) of the Securities Act;

24

6.   Enter a permanent injunction enjoining Secure Trust and ST Underwriters from violating Section 15(a) of the Exchange Act.

7.   Enter a permanent injunction enjoining Smith from aiding and abetting violations of Section 15(a) of the Exchange Act by Secure Trust and ST Underwriters.

8.   Enter an order requiring Defendants to disgorge all ill-gotten gains or unjust enrichment from the securities sales described above, plus prejudgment interest;

9.   Appoint a receiver to preserve the assets of Defendant Secure Trust in order to facilitate the ability of Secure Trust to disgorge ill-gotten gains;

10.   Appoint a receiver to preserve the assets of Defendant ST Underwriters in order to facilitate the ability of ST Underwriters to disgorge ill-gotten gains;

11.   Appoint a receiver to preserve the assets of Defendant SCF in order to facilitate the ability of SCF to disgorge ill-gotten gains;

12.   Enter an order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21 (d)(3)(A) of the Exchange Act [15 U.S.C. § 78u(d)(3)(A)], imposing civil money penalties against Defendants.

13.   Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

14.   Award such other and further relief as this Court may deem just, equitable, appropriate or necessary for the enforcement of the federal securities laws for the benefit of investors, including such relief contemplated by Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5).

Dated:      July 15, 2011                              Respectfully submitted,


                                                       _Duane K. Thompson_
Of Counsel:                                            Duane K. Thompson
Scott Friestad                                         *Assistant Chief Litigation Counsel*
Associate Director                                     Donna K. Norman
Brian Quinn                                            *Senior Counsel*
Assistant Director                                     U.S. Securities and Exchange Commission
Division of Enforcement                                00 F Street NE
U.S. Securities and Exchange Commission                Washington D.C. 20549-5020
                                                       Phone:  202-551-7159
                                                       Fax:  202-772-9246
                                                       thompsond@sec.gov


Local Counsel for Plaintiff:


PAUL J. FISHMAN
United States Attorney
(Designated Local Counsel)
By:  J. ANDREW RUYMANN
Assistant U.S. Attorney
402 East State Street, Room 430
Trenton, New Jersey 08608
Phone:  609-989-0563
Fax:  609-989-2360