UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| U.S. Securities and Exchange Commission, <br><br> Plaintiff, <br><br> v. <br><br> Secure Capital Funding, et al., <br><br> Defendants. | Civ. No. 11-916 <br><br> **OPINION** |

THOMPSON, U.S.D.J.

The matter before the Court concerns Plaintiff U.S. Securities and Exchange Commission's, ("Plaintiff's"), First Amended Complaint, (Doc. No. 29), against Defendants Secure Capital Funding Corporation, ("SCF"), ST Underwriters Corporation, ("STUC"), Alan Smith, ("Smith"), and Kiavanni Pringle, ("Pringle"). A default judgment as to liability and injunctive relief has previously been entered against these defendants, (collectively, "Defendants"). (Doc. Nos. 94 and 95).[1] For the reasons set forth below, the Court supplements its June 28, 2013 Order and Opinion, (Doc. Nos. 94 and 95).[2]

BACKGROUND

Background for this matter, including the facts and law relating to the liability of SCF, STUC, Smith and Pringle, is set forth in its entirety in this Court's Opinion dated June 28, 2013 (Doc. 94).

---

[1] Smith and Pringle failed to appear at the hearing or to have counsel enter an appearance on their behalf.
[2] The Court has based its rulings on the evidence adduced at the hearing conducted before the Court on December 18, 2013, the evidentiary material submitted by Plaintiff, (Doc. No. 85), and the entire record in the case.

1

DISCUSSION

The Court will address the following issues: (1) Smith's obligation to disgorge ill-gotten gains; (2) Smith's obligation to pay prejudgment interest; (3) Smith's obligation to pay a civil penalty; and (4) Pringle's obligation to pay a civil penalty.

**1. Smith's Obligation to Disgorge Ill-Gotten Gains**

"Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." *S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997). "Disgorgement of illegally derived funds is a remedy within the equitable powers conferred on this Court [. . .]." *S.E.C. v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996) *aff'd,* 124 F.3d 449 (3d Cir. 1997). "The district court has broad discretion in fashioning the equitable remedy of a disgorgement order." *Id*. (citations omitted).

The SEC has the initial burden of establishing that "its disgorgement figure reasonably approximates the amount of unjust enrichment." *Id*.; *S.E.C. v. Lazare Indus., Inc.*, 294 F. App'x 711, 714 (3d Cir. 2008) (amount of disgorgement reviewed under "abuse of discretion" standard); *see SEC v. Graystone Nash, Inc.*, 820 F. Supp. 863, 875 (D.N.J. 1993). In meeting its burden, the "plaintiff is not required to trace every dollar of proceeds misappropriated by the defendants [. . .] nor is plaintiff required to identify monies which have been commingled by them." *Hughes Capital Corp.*, 917 F. Supp. at 1085; *see also SEC* v. *Huff*, 2012 WL 10862, at *1 (11th Cir. Jan. 3, 2012) ("The SEC's burden for showing the amount of assets subject to disgorgement [. . .] is light: a reasonable approximation of a defendant's ill-gotten gains.").

Once the plaintiff has established that the disgorgement figure is a reasonable approximation of unlawful profits, the burden of proof shifts to the defendants, who must "demonstrate that the disgorgement figure is not a reasonable approximation." *Hughes Capital Corp.*, 917 F. Supp. at

1085. "[A]ll doubts concerning the determination of disgorgements are to be resolved against the defrauding party." *Id.*; *S.E.C. v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) ("Exactitude is not a requirement; [s]o long as the measurement of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.").

> [W]here a defendant's record-keeping or lack thereof has so obscured matters that calculating the exact amount of illicit gains cannot be accomplished without incurring inordinate expense, it is well within the district court's discretion to rule that the amount of disgorgement will be the more readily measurable proceeds received from the unlawful transactions.

*SEC v. Calvo*, 378 F.3d at 1217-18.

Smith's ill-gotten gains were at least $3.4 million. Smith received most of his ill-gotten gains from investors who were directed to send money to a New Jersey bank account in SCF's name. Smith used SCF, and co-defendant Bertram A. Hill, in his fraudulent securities offerings. A small portion of Smith's ill-gotten gains came from investors who were told to send their money to a bank account in California in the name of Secure Capital Corporation ("SCC"), another company that Smith used to facilitate his fraudulent activities. In both cases, Smith's share of the fraud proceeds was wired from bank accounts in the U.S. to a bank account in the Republic of Latvia. These facts are established by the testimony and documentary evidence adduced at the December 18, 2013 hearing, including the testimony of Donna K. Norman concerning Plaintiff's investigation of the fraud; the testimony of Bertram A. Hill concerning the division of fraud proceeds as between Smith and SCF; the Declaration of Benjamin Johnson, Jr., (Plaintiff's Hearing Ex. 3), concerning the division of fraud proceeds between Smith and SCC; banking records and other transaction records, (Plaintiff's Hearing Ex. 1, 2, 4, 11-14); and Smith's email instructions to Hill to wire fraud proceeds, (Plaintiff's Hearing Ex. 15).

Approximately $2.95 million of Smith's total $3.4 million of ill-gotten gains was routed through SCF's bank accounts in New Jersey and then wired to the account in Latvia. A large percentage of this money came from Smith's 80% share of the $3.8 million that was routed through SCF. Pursuant to instructions from Smith and/or Hill, investors sent their money to a bank account in SCF's name in New Jersey. Evidence shows that Hill was the sole signatory authorized to make withdrawals from the bank account and the sole officer of SCF. The account at issue is identified as Account No. xxxxx6052 at JP Morgan Chase. Smith and Hill had agreed to split the proceeds, with 80% going to Smith and 20% going to SCF. Pursuant to that agreement, and on Smith's instructions, Hill wired $2.84 million of the $3.7 million from SCF's bank account in New Jersey to a bank account in the Republic of Latvia without investors' knowledge or consent. The account is in the name of a Latvian corporation that purports to invest in real estate, "LV71xxxxxx-xxx-xxxxx at Regionala Investiciju Banka, J. Alunana 2, Riga, Latvia." The Court finds that the $2.84 million that Hill wired to Latvia on Smith's instructions represents the proceeds of fraud perpetrated in substantial part in the United States.

Smith reaped additional ill-gotten gains of $450,000 as his share of monies that investors were instructed to send to a bank account in California in SCC's name. Smith's $450,000 share was part of a total of at least $500,000 that investors were told to send to SCC's business checking account in a Riverside, California branch of JP Morgan Chase. (*Id.*). SCC wired $450,000 of the $500,000 total to the same account in Riga, Latvia to which SCF sent Smith's proceeds from the New Jersey-based fraud. When added to Smith's approximately $2.95 million share of fraud proceeds routed through SCF, Smith's $450,000 share routed through SCC adds up to ill-gotten gains of approximately $3.4 million.

Smith's disgorgement obligation will be partially satisfied by applying available funds from SCF's bank account at JP Morgan Chase in New Jersey. Fraud proceeds in the total amount of $130,700 were deposited into the JP Morgan Chase account after this Court issued a Temporary Restraining Order on February 18, 2012, freezing withdrawals from the account. Smith's 80% share of the $130,700 amounts to $104,500. The freeze prevented Hill from wiring Smith's 80% share to the bank account in Latvia as he had done with Smith's share of fraud proceeds deposited into the JP Morgan Chase account prior to the freeze order. JP Morgan Chase is ordered to pay that money to a bank account to be established by the Distribution Agent appointed by the Court to return fraud proceeds to investors pursuant to the Plan of Distribution, (Doc. 90). After the $104,560 offset for funds that will be seized from the JP Morgan Chase account, Smith's remaining disgorgement obligation will be $3,295,440.

**2. Smith's Obligation to Pay Prejudgment Interest**

"Prejudgment interest on damages awarded pursuant to a violation of the federal securities laws is a matter of judicial discretion. In exercising its discretionary powers, a court must consider both compensation and fairness." *S.E.C. v. Hughes Capital Corp.*, 917 F. Supp. at 1089-90; *S.E.C. Comm'n v. Hasho*, 784 F. Supp. 1059, 1112 (S.D.N.Y. 1992); *see S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1476 (2d Cir. 1996) (decision to award prejudgment interest, like the decision to grant disgorgement, is left to the district court's "broad discretion"). Proof of a defendant's scienter justifies the award of prejudgment interest. *S.E.C. v. Utsick,* 2009 WL 1404726at *15 (S.D. Fla. May 19, 2009) ("in the context of Section 10(b) and Rule 10b-5 actions, a defendant's scienter is sufficient to justify an award of prejudgment interest").

As for the amount of the prejudgment interest, most "courts have adopted the [IRS] underpayment rate without controversy." *S.E.C. v. Yun*, 148 F. Supp. 2d 1287, 1292 (M.D. Fla.

5

2001); *see S.E.C. v. Hughes Capital Corp.*, 917 F. Supp. at 1090 (adopting the underpayment rate method). "That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from [his] fraud." *S.E.C. v. Aleksey*, 2007 WL 1789113, at *2 (M.D. Fla. June 19, 2007) (*quoting SEC v. First Jersey Securities, Inc.*, 101 F.3d at 1476).

Here, the Court finds that Smith must pay $319,481.76 in prejudgment interest. This prejudgment interest figure is calculated by applying the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621 (a)(2) to Smith's ill-gotten gains of approximately $3.4 million. The starting date for the calculation is February 28, 2011, the date on which the last monies were received into the JP Morgan Chase account from investors. The ending date for the calculation is January 14, 2014. Smith is not entitled to deduct from the calculation of prejudgment interest the $104,560 that has been frozen in the JP Morgan Chase account because that is not an interest-bearing account, and thus, no interest is available to partially offset Smith's obligation to pay prejudgment interest.

**3. Smith's Obligation to Pay a Civil Penalty**

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act set forth three tiers of civil money penalties. 15 U.S.C. §§ 77t(d), 78u(d)(3). A third tier penalty is appropriate when a defendant's violation involved fraud or deceit and resulted in substantial loss to others or created a significant risk of substantial loss to others. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B).

For violations occurring after March 3, 2009, a third tier penalty imposed upon an individual may not exceed the greater of the following: (1) $150,000 for each violation by a natural person and $725,000 for each violation by any other person; or (2) the gross amount of the defendant's pecuniary gain. 17 C.F.R. § 201.1002, Table IV to Subpart E.

Courts consider the following factors in determining the amount of penalty to impose:

> (1) the egregiousness of the violations at issue, (2) defendant's scienter, (3) the repeated nature of the violations, (4) defendant's failure to admit to their wrongdoing, (5) whether defendant's conduct created substantial losses or the risk of substantial losses to other persons, (6) defendant's lack of cooperation and honesty with authorities, if any, and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendant's demonstrated current and future financial condition.

*S.E.C. v. Bear Stearns,* 626 F. Supp. 2d 402, 407 (S.D.N.Y. 2009). A defendant's ability to pay is "at most" one factor the Court should consider when imposing a penalty; securities laws do not prohibit the imposition of a penalty in excess of a violator's ability to pay. *S.E.C. v. Warren,* 534 F.3d 1368, 1370 (11th Cir. 2008).

Courts have applied "two general methods for assessing civil penalties in securities cases, a 'per violation' approach and a 'proportional approach.'" *S.E.C. v. Koenig,* 532 F.Supp.2d 987, 995 (N.D. Ill. 2007). Courts applying a "per violation" approach have imposed a penalty for each of the false filings made by a violator, *see S.E.C. v. Huff,* 758 F. Supp. 2d 1288, 1366 (S.D. Fla. 2010); *SEC v. Coates,* 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001), or for each of the securities laws violated by the defendant, s*ee S.E.C. v. Henke,* 275 F. Supp. 2d 1075, 1086 (N.D. Cal. 2003).

After considering the factors identified in *Bear Stearns* and the fact that a "per violation" approach would not result in a sanction sufficient to serve the interests of punishment or deterrence, the Court finds that the proportional approach and a civil penalty of $3.4 million is appropriate with respect to Smith. *Bear Stearns*, 626 F. Supp. 2d at 407. Smith masterminded a significant fraud with a high degree of scienter, causing substantial loss to investors. Moreover, Smith has neither acknowledged his wrongdoing nor cooperated with Plaintiff or the Court.

### 4. Pringle's Obligation to Pay a Civil Penalty

Pringle is assessed a single third tier penalty of $150,000 under the "per violation" approach. Pringle did not personally realize profits through his participation in the scheme; however, he did act with a high degree of scienter and caused a substantial loss to the four investors he brought to Smith. Pringle identified and induced at least four investors to send a total of $400,000 to SCC or SCF. *See* 2nd Supp. Norman Decl., ¶ 17; 4th Supp. Norman Decl., ¶ 16and Ex. 1 [Pringle Deposition], 81:11-83:14. This money would be leveraged for $35 million worth of credits in Swiss accounts and used to purchase securities. *See* 4th Supp. Norman Decl., ¶ 16 and Ex. 1 [Pringle Deposition], 77:9-20; 99:5. Pringle falsely told his customers that each customer was purchasing access to "non-depleting" accounts that offered "100 to one" leverage with no risk of loss. *See* 4th Supp. Norman Decl., ¶ 16 and Ex. 1 (Pringle Deposition), 87:12-89:23.

Based on Pringle's actions, one investor from Nevada wired $50,000 to SCC's bank account in California as payment for purported "Swiss debentures" of Secure Trust. *See* Supp. Norman Decl., ¶¶ 11-16; 4th Supp. Norman Decl., ¶ 16 and Ex. 1 (Pringle Deposition)], 157:23-163:24; 181:20-182:18. Pringle told this investor that the $50,000 payment bought him access to a $5 million line of credit as to which PP&M Trade Star Partners (a trade name that Pringle used) would bear any risk and pay all fees. *Id.* Pringle also induced this investor to execute a power of attorney that gave Pringle sole authority over the purported Swiss account. *Id.* However, the investor never had access to his money or received any account statements after complying with Pringle's instructions. Pringle induced this investor, along with others, to send payments that were ultimately funneled to Smith even though Pringle had never met Smith in person and had no justifiable reason to believe that Smith's companies or the securities or the "100 to one"

leveraged lines of credit they were offering ever existed.  *See* 4th Supp. Norman Decl., ¶ 16 and Ex. 1 [Pringle Deposition], 39:25-45:24; 101:13-21.

Pringle has shown disregard for the judicial process and admitted to committing additional acts of securities fraud even after being preliminarily enjoined in this case.  *See* Plaintiff's Hearing Ex. 5, 6 and 7.

## CONCLUSION

For the reasons set forth above, the Court supplements its June 28, 2013 Order, (Doc. No. 95).  An appropriate order follows.


*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.

Date: 3/10/14